GANDÍA, PLAINTIFF AND APPELLANT, *v.* TRÍAS ET AL., DEFENDANTS AND APPELLEES (STUBBE, APPELLANT).

APPEALS from the District Court of San Juan in Actions for Liquidation of Partnership.

Nos. 2118 and 2187.—Decided July 5, 1921.

PARTNERSHIP—ASSETS—INDIVIDUAL INTERESTS—LIQUIDATION.—Each partner is the owner of all of the partnership property, subject to equal ownership by each of the other partners. No one of the partners can become the absolute owner of any part of the partnership property without the consent of the other partners. The individual interest of a partner in the partnership assets must be determined by a liquidation of the partnership.

ID.—DISSOLUTION—DISTRIBUTION OF ASSETS—RIGHT OF ACTION.—When a deed of dissolution of a partnership has been executed and, after a balance and inventory, all of the assets susceptible of immediate division and allotment have been distributed, any one of the partners has a right to sue for the property allotted to him.

ID.—PLEADING—FRAUD.—The facts alleged show whether or not there is a cause of action, and it is of no importance that the action was erroneously styled. It is not important to prove the alleged fraud if the facts themselves, regardless of whether or not they were committed fraudulently, show a good cause of action.

ID.—LIQUIDATOR—RESIGNATION—ACCOUNTING.—The fact that the liquidator of a partnership resigns does not relieve him from the obligations contracted while he had charge of the liquidation, one of these being to render a

detailed and verified account of the disposition of the funds which came into his hands as such liquidator.

ID. — JUDGMENT — PRAYER. — A judgment may contain pronouncements different from those prayed for by the parties if they are necessarily included in the prayers and are justified by the pleadings and the evidence.

The facts are stated in the opinion.

*Mr. José de Guzmán Benítez* for the plaintiff-appellant.

*Messrs. C. Coll Cuchí* and *G. Cruzado Silva* for the defendant-appellant.

MR. JUSTICE DEL TORO delivered the opinion of the court.

Pedro Gandía Córdova brought an action in the District Court of San Juan, Section 1, against Arturo Trías and Johann D. Stubbe for the "liquidation of the mercantile partnership of Gandía & Stubbe, for the removal of the liquidator, Arturo Trías, and for damages."

The defendants answered. At the trial a large volume of oral and documentary evidence was examined and the court finally dismissed the complaint as against defendant Trías and adjudged that defendant Stubbe pay to the plaintiff the sum of $27,936.86.

Plaintiff Gandía appealed from that part of the judgment which dismissed the complaint as against defendant Trías, and defendant Stubbe appealed from that part of it which adjudged him to pay the said sum. We will consider the two appeals in this opinion and dispose of them by a single judgment.

The allegations of the complaint were as follows:

1. That the plaintiff and the defendants are of age, with full civil capacity, and reside in the judicial district of San Juan, P. R.

2. That the plaintiff and defendant Stubbe were the only members of the mercantile partnership of Gandía & Stubbe and, having agreed upon its dissolution, they caused an inventory to be made and a balance to be struck of the business of the partnership by its bookkeeper, Arturo Trías, on July 18, 1916, with the cooperation of the cashier, Federico Stubbe,

and under the instructions and advice of defendant Stubbe, the purpose of the balance being to close the books and, with the balance as a basis, carry the dissolution into effect. The said balance showed that on that date there was $2,076.87 in the safe and that the firm owed $154.88 to the banks.

3. That on July 24, 1916, the two partners executed articles of dissolution, to be effective as from the date of the balance.

4. That in the same deed the partnership was declared to be in liquidation and Arturo Trías was appointed as its liquidator.

5. That although there were some debts outstanding, it was agreed that certain properties should be divided between the partners, the reason therefor being stated in the ninth clause of the articles.

6. That after the dissolution of the partnership J. D. Stubbe and Federico Stubbe formed a new mercantile partnership under the name of Stubbe Brothers with offices at No. 9 Tanca Street of this city, and the liquidator, Trías, went there, taking with him all of the account books. Gandía remained at the old place of Gandía & Stubbe.

7. That the liquidator did not comply with his lawful duty of preparing and giving to the partners an inventory of the assets and a balance of the accounts of the partnership in liquidation.

8. That the liquidator, Trías, sent to Gandía a statement of the transactions from July 24 to August 1, 1916, according to which there were $893.70 in the safe and $671.79 on deposit in the American Colonial Bank, and thereafter sent to him three other statements, including the transactions up to September 25, 1916.

10. That Gandía claimed that the sum of $14,234.06 was due to him as follows: $8,234.06 from the liquidator for declared dividends of the Porto Rico Fertilizer Company and $6,000 from J. D. Stubbe for sixty shares of stock of the said corporation, the private property of Gandía which in

the articles of dissolution he agreed to sell to Stubbe. His claim was denied and he was informed that "the said sums should pass into the hands of the liquidator to extinguish the obligations of the partnership, inasmuch as they had been allotted to Stubbe in the articles of partnership." Thereupon the plaintiff brought action No. 9434 against J. D. Stubbe for the annulment of the articles of dissolution and action No. 9436 against the Porto Rico Fertilizer Company to recover the dividends.

11. That in the said suit against Stubbe the plaintiff was allowed an inspection of the books and as a result of that and of his personal knowledge of the facts he brought the present action for damages and for the removal of the liquidator. Thereafter on the plaintiff's motion, the court appointed a receiver who took charge of the liquidation of Gandía & Stubbe and continued the expert examination of the books. And with the data finally obtained the plaintiff amended the original complaint as follows:

A. Trías failed to comply with his duties as liquidator in not giving to Gandía a copy of the balance and of the statement of accounts from September 25, 1916. The plaintiff alleges that these omissions were premeditated and malicious for the purpose of concealing the frauds practiced against Gandía in the liquidation.

B. In the statements Trías omitted all of the transactions of the firm from the 18th to the 24th of July, 1916.

C. Although knowing that on July 16, 1916, Gandía & Stubbe had on deposit in the banks the sum of $6,685.21, Trías, nevertheless, made it appear in the balance that Gandía & Stubbe were owing $154.88 to the said banks. The plaintiff alleges that this contradiction constitutes a malicious and premeditated concealment by the liquidator with the intent to subtract from the liquidation the said sum of $6,685.21.

D. On August 31, 1916, Trías made an entry offsetting a debit which he said had been made by mistake on March 29,

1915, thereby causing to reappear in the account of the banks a credit of $2,240 which he had made disappear from the same books. That alteration constitutes a malicious concealment without the knowledge and to the prejudice of Gandía.

E. On August 11, 1916, Trías made an entry whereby the following appeared as creditors of Gandía & Stubbe on that date: Successors of C. & J. Fantauzzi for $5,665; Fajardo Sugar Co. for $2,712.50; Yabucoa Sugar Co. for $3,221.24; M. Zavala & Co. for $9,585.05, and Antonio Olivari for $1,432.22, notwithstanding the fact that he knew that they were not such creditors. That entry was made by Trías in combination with J. D. Stubbe, it being stated in the entry that "the said Stubbe assumed the payment of these creditors," all for the purpose of defrauding Gandía.

F. Notwithstanding his knowledge that Gandía & Stubbe were entitled to $10,104.40 for declared dividends of the Porto Rico Fertilizer Company from the balance of May 29, 1915, Trías falsely made in the daybook of Gandía & Stubbe on July 21, 1916, the following entry: "Gandía & Stubbe, in liquidation, to dividends of the Porto Rico Fertilizer Company. Cancelation of the debit made in account number 2 on July 31, 1915, for the reason that the said dividends have not been distributed or even declared by the company, $10,104.40." And the plaintiff alleges that notwithstanding the fact that this entry was made three days after the date on which the deed of dissolution was made effective, it shows Gandía & Stubbe as debtors with a false balance of $10,090.05 instead of the Porto Rico Fertilizer Company as the debtor of Gandía & Stubbe for the real balance of $10,104.40; and the plaintiff further alleges that these simulations were made in order to defraud him of his half interest as a partner of Gandía & Stubbe.

G. Although he knew that in the deed of dissolution there was allotted to each partner the sum of $8,234.08, half of the dividends of the Porto Rico Fertilizer Company for the year 1916, on November 30, 1916, Trías made the following

entry in the daybook: ''J. D. Stubbe, account of liquidation. One-half of the account of dividends of the Porto Rico Fertilizer Company which the latter grants and assigns to the former in accordance with the deed of July 24, 1916, before notary Cay. Coll Cuchí, $8,234.06.'' And the plaintiff alleges that this simulation was made by liquidator Trías in combination with Stubbe to defraud the plaintiff for the benefit of Stubbe in the whole amount.

H. and I. That, exceeding his authority, Trías executed certain deeds amending other deeds relative to certain lots in Miramar.

12. That summing up the damages which the defendants have caused the plaintiff according to the foregoing allegations, they are as follows:

A half share in the $6,685.21 subtracted from the account of the banks, $3,342.60;

A half share in the $22,616.01 of the supposed credits made to appear from the entry in daybook No. 10 on August 11, 1916, and transferred to J. D. Stubbe by the same entry, $11,308;

A half share in the $10,104.40 as dividends for the year 1915 declared by the Porto Rico Fertilizer Company and canceled by the false entry made in the daybook on July 21, 1916, $5,052.20;

A half share in the $16,468.12 as dividends for the year 1916 declared by the Porto Rico Fertilizer Company, the said interest of Gandía having been subtracted by the false entry of November 30, 1916, $8,234.06.  Total, $27,936.86.

The complaint concludes with the following prayer:

''The plaintiff prays the court for a judgment sustaining the complaint and ordering that Arturo Trías be removed as liquidator of the partnership of Gandía & Stubbe, subject to the resulting liabilities, and adjudging the said Trías and Johann D. Stubbe to abide by the said removal and to pay to the plaintiff, Pedro Gandía, jointly and severally, all of the damages which they have occasioned him by the frauds alleged, and therefore to ·pay to him the sum of

$27,936.88, together with the costs of this action, including $5,000 for fees of the plaintiff's attorney."

To this amended complaint defendants Trías and Stubbe jointly made answer as follows:

1. That they admit the first count of the complaint.

2. That they admit the second count, except in so far as it avers that the balance was struck with the cooperation of Federico Stubbe and under the direction and advice of J. D. Stubbe, which they deny; and they allege specifically that the said balance was made without the participation of Federico Stubbe and under the authority of both Gandía and Stubbe, the partners.

3, 4 and 5. That they admit the third, fourth and fifth counts of the complaint.

6. That it is true that after the deed of dissolution was executed J. D. Stubbe and Federico Stubbe formed the mercantile partnership of Stubbe Brothers with offices at No. 9 Tanca Street and that the liquidator went there, but the defendants allege that he did so not at the instance of Stubbe, but at the instance of Gandía, and that he did not take with him all of the books, but only those that were necessary for the liquidation.

7. They deny the seventh count and allege that Trías did not send Gandía copies of the inventory and balance because they had already been made and struck when Gandía & Stubbe dissolved, and that Trías rendered accounts to Gandía and on several occasions asked his approval up to the time when this action was brought.

8. That they admit the eighth count.

9. That it is true that Trías did not send to Gandía any statements after September 25, 1916, but they deny that Gandía was deprived of information, for the liquidator was always willing and ready to furnish them; that Trías resigned as liquidator and the partnership is now in the hands of a liquidator appointed by the court.

10. That they deny the tenth count of the complaint and allege that the plaintiff has made no claim against them; that by the articles of dissolution Stubbe "bound himself to pay to the plaintiff, Pedro Gandía, such an amount as he would appear to be entitled to after a liquidation of the partnership and considering the allotment of properties made to each of the partners in the said deed of dissolution;" that it is not true that Stubbe agreed to pay to Gandía $6,000 for sixty shares of stock of the Porto Rico Fertilizer Company, for these shares belonged to the partnership of Gandía & Stubbe and not to Gandía; that the $8,234.06 to which the tenth count refers was not for declared dividends on sixty shares, but represented fifty per cent of the dividends on two hundred and fifty shares owned by Gandía & Stubbe, Trías having credited Gandía with the said sum of $8,234.06; that it is not true that Stubbe's attorney told Gandía that these sums should go into the hands of the liquidator for the extinction of the obligations of the partnership, and that Stubbe was and is willing and ready to pay to Gandía such a sum as he may be entitled to in accordance with the liquidation.

11. They deny the eleventh count and specifically allege the following:

A. Trías rendered accounts and omitted nothing with premeditation. The charges of fraud are specifically denied in this and the following subdivisions of this answer.

B. Although the dissolution was made effective as of the date of the balance, Trías did not take charge of the liquidation until July 24 and the transactions from the 18th to the 24th of July appear in the books of Gandía & Stubbe.

C. That Trías was not the cashier, but the bookkeeper, of Gandía & Stubbe and struck the balance in accordance with the books. In the deed of dissolution all of the assets of the firm were divided between the partners, except those that were necessarily subject to liquidation, the balance in the safe and in the banks having passed into the liquidation.

There was no malicious contradiction for subtracting the sum of $6,685.21, or any other sum, from the banks.

D. The entry of August 31, 1916, was made to correct an error in accounting proceeding from another entry of May 29, 1915. Trías did not know what was the amount on deposit in the banks. When he had in his possession as liquidator the book of the American Colonial Bank he ascertained the existing error and corrected it.

E. They deny that Trías made the entry in which the persons named were falsely made to appear as creditors of Gandía & Stubbe and specially allege that on August 11, 1916, Trías credited the amounts of the said debts to the account of J. D. Stubbe because Stubbe had paid them, their total amount being $22,616.01. Gandía & Stubbe were the managers of the Porto Rico Fertilizer Company and sometimes when the firm was in need of money they took the money of the corporation and replaced it afterwards. When the dissolution was made the said persons had paid their accounts to the Porto Rico Fertilizer Company, but this corporation had not received the money because it had been included in the cash of Gandía & Stubbe by virtue of which the said persons appeared as creditors of Gandía & Stubbe and it being then agreed that inasmuch as according to the allotment all of the stock of the Porto Rico Fertilizer Company was to pass to Stubbe and the business of the said corporation was to be assumed by him, he would pay the said sums to the Porto Rico Fertilizer Company, which would be credited to his account in the liquidation, Stubbe having actually paid, after the liquidation, all of these sums in cash to the Porto Rico Fertilizer Company.

F. The credit of $10,104.40 to Gandía & Stubbe for dividends of the Porto Rico Fertilizer Company was a mistake because that sum had not been distributed and still appears in the books of the corporation as undistributed profits, and the entry was made with the common consent of the plaintiff and the defendant to correct an error of accounting.

G. The sum of $8,234.06 to which this subdivision refers is the same to which the tenth count refers, Trías having credited it to Gandía in the liquidation;

H and I. Trías admits that as liquidator he executed the deeds of amendment referred to.

12. They deny this count which constitutes a summary of the allegations of the complaint.

And for all of the foregoing the defendants prayed the court to dismiss the complaint and impose upon the plaintiff the costs, expenses, disbursements and attorney fees.

The issue being thus joined, the case went to trial and the court finally entered the judgment to which we have referred. In the course of the opinion which the trial judge rendered in support of his judgment it appears that the court found the following facts:

"First: That on June 27, 1916, there was deposited in the American Colonial Bank in the name of the firm of Gandía & Stubbe the sum of $9,118.14, which added to other sums entered in the cash-books of Gandía & Stubbe during the same month amounted to $47,025.43 and upon being posted to the ledger the said sum was reduced to $42,025.43, leaving, therefore, a difference of $5,000 in the money on deposit in the said bank.

"That in the bank's account of the firm of Gandía & Stubbe the bank had a credit against Gandía & Stubbe of the amount of $35,645.35, which upon being posted to the ledger (the book which served as a basis for the balance on which the liquidation of the partnership was based) was entered as $36,145.35, showing, therefore, an excess of $500 to the credit of the banks and making them appear as creditors of Gandía & Stubbe when in fact they were not.

"That at the time of the dissolution and liquidation of the partnership of Gandía & Stubbe the books did not show deposits in the banks, and particularly in the American Colonial Bank, of the sum of $2,240.09, and as it was not mentioned in the liquidation, the plaintiff, of course, was not informed of its existence; nevertheless, on August 31, 1916, or after the said dissolution, liquidator Trías, by an entry in the journal, made the said sum appear; but the plaintiff was not informed of its existence.

"That on July 18, 1916, the banks therefore had on deposit in favor of Gandía & Stubbe the sum of $6,685.21, which amount is the result of the addition of the three items mentioned in the three preceding paragraphs, namely, $5,000, $500 and $2,240.09 after deducting $900 used for the payment of salaries to the employees and charged by mistake ·to the bank's account instead of to general expenses, and after deducting also the $154.88 which according to the articles of dissolution the firm of Gandía & Stubbe owed to the banks.

"Second: That the Yabucoa Sugar Co., Fajardo Sugar Co., A. & P. Oliveri Mathei, Successors of C. & J. Fantauzzi, and M. Zavala & Co., never were *creditors* of the partnership of Gandía & Stubbe, but were *debtors* of the Porto Rico Fertilizer Co. for the amounts mentioned in the eleventh count on page 8 of the amended complaint, and that they settled their accounts in full with the Porto Rico Fertilizer Co. prior to the execution of the articles of dissolution of July 24, 1916.

"Third: That according to the evidence, some of these sums were paid by the debtors of the Porto Rico Fertilizer Company a very short time before the dissolution of the partnership of Gandía & Stubbe, and were transferred to defendant Stubbe after the said liquidation by entries made in the books by the liquidator charging defendant Stubbe with the obligation of paying these debts, without any showing as to whether they have been paid or are still pending payment.

"Fourth: That at the time of the dissolution and liquidation of the partnership of Gandía & Stubbe the Porto Rico Fertilizer Co., as was admitted in the said deed, had declared and distributed, and Gandía & Stubbe had received, the dividends for the year 1915, but notwithstanding this, on July 21, 1916, Trías made an entry in the journal of Gandía & Stubbe canceling the debit of $10,104.40 under the supposition that the said dividends had not been declared by the company.

"Fifth: That the dividends for the year 1916, amounting to $16,468.12, were likewise declared by the company and $8,234.06 allotted to each of the partners, and that the plaintiff has not assigned his said share of the dividends to defendant Johann D. Stubbe, as would seem from the entry made by the liquidator on November 30, 1916."

On the foregoing facts let us discuss the errors assigned by appellant Stubbe. The first question raised is as follows:

"A partner has no cause of action for damages while the final liquidation of the partnership is pending, even after the dissolution of the firm."

Appellee Gandía replies:

"That that question cannot be considered by the Supreme Court because it refers to a matter which is not in issue because it was not raised by demurrer for lack of a cause of action, or in the answer."

The pleadings do not show that the question was expressly raised. The defendants accepted the issue as raised by the plaintiff. However, from the opinion of the trial court it appears that the question was raised before judgment, the court deciding it adversely to the defendants, as follows:

"The defendant summarizes his conclusions to the effect that the complaint is premature because the partnership of Gandía & Stubbe is still in liquidation; that the plaintiff has not proved his allegations; that he has not proved the fraud alleged, nor damages.

"The first of these conclusions may be admitted as necessary to establish a system of defenses, but taken alone it is not sufficient to justify the dismissal of the complaint.

"Gandía & Stubbe terminated this partnership agreement when the instrument of July 24, 1916, was executed. This was not a deed of dissolution, but a formal deed for the liquidation of the partnership. Bases were established therefor; properties were distributed and allotted; the partners took possession of them, and each took what that liquidation gave him. And the partners were so anxious about the efficacy of that agreement that they carefully met the difficulty of the provision of the Code of Commerce forbidding a partner to take possession of his share until the debts and obligations of the partnership are fully settled, and appointed a liquidator to pay the unimportant debts of the partnership, giving him instructions as to the manner of doing so, and both partners promising to deliver to him such sums of money as he might need to cover the said obligations.

"The partnership, therefore, was liquidated and it so appears from the deed itself as a whole and from each of its clauses."

In our opinion the question could have been raised by
demurrer, but it could also be raised, as it seemingly was,
at the termination of the trial on the result of the pleadings
and the evidence.

The appellant cites several decisions in support of his
contention. The facts on which these decisions were based
are different and the jurisprudence has not the extent as-
cribed to it. We will refer to one of them, *Riddell* v. *Ramsey
et al.*, 31 Mont. 386. The appellant copies the most of it
into his brief and in fact it condenses admirably the juris-
prudence on the point. The Supreme Court of Montana
transcribes the complaint which originated the action and
then says:

"Does this complaint state a cause of action against defendants?
From a cursory reading of the same, doubts would naturally arise
as to whether it was intended to state a cause of action in assumpsit,
for conversion, or for damages for the misappropriation of funds
of the partnership by defendants and Roach by reason of a fraudulent
conspiracy between them for that purpose. But counsel for re-
spondent have stated in their brief the theory upon which they
rely for the sufficiency of their complaint, and therefore we shall
consider only whether a cause of action is stated upon that theory.

"Counsel for respondent say in their brief: 'The right of the
plaintiff to maintain this suit, as set forth in the amended complaint,
is his personal right to recover damages in tort for the wrongs suf-
fered by him individually in consequence of the fraudulent con-
spiracy of the defendants, and the acts done in pursuance thereof
to the damage of the plaintiff. * * *'

"One of the fundamental requisites of a good complaint in an
action in tort for damages is that it must show by proper allegation
that plaintiff was damaged by the acts of defendants complained of.
It is perceived that by this complaint it is alleged that Riddell
(plaintiff), Roach and Suiter formed a copartnership under the
firm name of Riddell & Roach to construct the School of Mines
building at Butte, Montana, under a contract with the state of
Montana. There is no allegation that either copartner contributed
any money or property to the copartnership, or that it had any
assets except such as would arise in the performance of the contract

for the erection of the building. The complaint further alleges that it was agreed between the copartners that these assets, when received, should be deposited with the Commercial National Bank of Bozeman, to be used only in payment for material and labor required in the erection of the building, except that each copartner might withdraw $125 per month for living expenses; that the firm deposited large amounts of money with this bank subject to the above agreement, of which defendant Ramsey had knowledge, and to which he consented; that defendants and Roach, through a fraudulent conspiracy, withdrew from these assets so deposited and misappropriated the sum of $8,200, and converted the same to their own use. It is apparent that the injury complained of was damages resulting from this alleged unlawful withdrawal of a portion of the partnership assets.

"What was the interest and ownership of each partner in the firm assets? 'Every partner owns the whole partnership property subject to equal ownership of every other partner; and no one partner can make his own ownership of any part absolute, or relieve it from the incumbrances of the ownership of the others, without their consent. * * * But although no partner owns absolutely any part of the property, he has an interest in the whole.' (Parson on Partnership, Sec. 112.)

"The individual interest of one partner in the firm assets can only be ascertained by a settlement of the partnership. (*Bopp* v. *Fox*, 63 Ill. 540; *Chandler* v. *Lincoln*, 52 Ill. 74; *Menagh* v. *Whitwell*, 52 N. Y. 146, 11 Am. Rep. 683; *Sindelare* v. *Walker*, 137 Ill. 43, 27 N. E. 59, 31 Am. St. Rep. 353.)

"Such settlement can only be accomplished by agreement of the partners, or by an action in equity for an accounting settling their several interests. Plaintiff's injury, as above stated, is only claimed to arise from this alleged misappropriation. In order to be injured as an individual by this misappropriation, his complaint must show that he was the individual owner, or entitled to the possession, of the funds misappropriated at the time of the alleged misappropriation. The only allegations of individual ownership or right to possesion of the funds alleged to have been misappropriated are found in paragraphs 8 and 10 of the complaint. In paragraph 8 it is alleged that neither the defendants nor Roach were entitled to any part of the money converted, and, had it not been converted, the whole thereof would have remained to plaintiff upon dissolution

of the partnership, and would have belonged to him free from any claim of defendants or Roach. In paragraph 10 we find allega- tions to the effect that in March, 1897, Roach sold to plaintiff all his right in and to the copartnership property, claims, demands and rights of action, and that the rights of Roach were fully settled and determined, and that plaintiff is the owner of all of Roach's right in the copartnership property; that on November 26, 1897, the copartnership was dissolved as to Suiter by mutual agreement between them, and Suiter transferred and assigned to plaintiff all his rights in the partnership and in and to all the accounts, claims, demands, rights of action and property belonging to such partnership, and that plaintiff is the owner of all the property, rights and claims theretofore belonging to the copartnership in which said Roach and Suiter had any interest as copartners; that Roach and Suiter as- signed to plaintiff upon the termination and dissolution of the part- nership all rights of said copartnership in and to all the moneys theretofore converted therefrom by defendants and Roach; that at the time of the alleged conversion and at the time of the settlement of its business and affairs between plaintiff and his copartners the whole of said amount was in excess of the rights of Roach and Suiter in said copartnership and in the money and property belonging thereto; that upon the dissolution of the partnership its business and affairs were settled as between plaintiff and Roach and Suiter, and that the whole sum of money converted was due and owing, and belonged to plaintiff.

"Are these allegations sufficient to show that the plaintiff was individually the owner or entitled to the possession of the money alleged to have been misappropriated? From a reading of them one is led to believe that in the preparation of the complaint plain- tiffs attorneys intended to rely upon an assignment and transfer to plaintiff by Suiter and Roach of all their rights of action in reference to the money alleged to have been misappropriated, or an assign- ment of all their rights in said fund, however, in their brief they distinctly say that they do not base plaintiff's rights upon such assignment and transfer. If they do not base plaintiff's rights upon such assignments or transfers, the allegations of the same in the complaint must be treated as surplusage. As a matter of law, plain- tiff could not be vested with a right of action to recover the interests of Roach and Suiter in or to any of the funds so alleged to have been misappropriated by the assignment pleaded. According to the

allegations of the complaint, Roach and Suiter are both guilty of misappropriation of copartnership funds. They therefore could not assign the right of action to recover such funds against themselves. No person can transfer to another a right of action against himself. The right of action now claimed by plaintiff is one based upon the fraudulent conduct of Suiter and Roach, concurred in by Ramsey. We cannot conceive how such right of action would, in the first place, rest in Suiter and Roach, because no one can have a right of action against himself. It is absurd to say that Roach and Suiter could transfer to plaintiff a right of action against themselves growing out of their own fraud and misappropriation. (*Hasselman* v. *Douglass,* 52 Ind. 252; *Van Scoter* v. *Lefferts,* 11 Barb. 140.)''

The court then reviews at length a number of decisions in all of which the rule is laid down that in this class of cases a previous balance or liquidation of the partnership determining the interest of each of the partners therein is necessary, and then goes on to say:

''We are satisfied, under the above authorities, that the allegations of plaintiff's complaint are not sufficient to show that he was the individual owner or entitled to the possession of the moneys alleged to have been misappropriated.

''The only injury which could possibly result to plaintiff from the acts of misappropriation would be that plaintiff's interest and ownership in the property, assets and funds of the copartnership had been affected and reduced. How can it be said that the mis- appropriation of a portion of the funds of a partnership is an injury to one partner's individual interest therein until after a final accounting, either by way of a bill in equity for such purpose or by the specific agreement of the partners, has been had between the partners, and it has been determined that such funds belonged to such partner?''

In this case there was a dissolution of the partnership, a balance and a liquidation as essentially required by jurisprudence, which we shall see still more clearly in discussing the evidence. Perhaps we may not go as far as the district court did in considering the several claims set up in the complaint, but we hold generally that it can not be concluded

that the plaintiff was absolutely without a cause of action against Stubbe under the facts alleged. See the case of *González* v. *Alvarez,* 27 P. R. R. 427, wherein the following rule was laid down:

"When a partnership is dissolved and liquidated any partner has a right to claim what belongs to him according to the result of the balance."

The second fundamental question raised is as follows:

"The court erred in holding that the system of civil procedure in force in Porto Rico permits a district court to render a judgment at variance with the cause of action set up in the complaint, whereas plaintiff Gandía pleaded an action *ex delicto* and the judgment acknowledges that he had a cause of action *ex contractu.*"

The appellee contends that this court should not consider that assignment because in accordance with its repeated jurisprudence the appeal is not from the grounds of the judgment, but from the judgment itself. The appellee cites the cases of *González* v. *Vilella et al.,* 24 P. R. R. 262; *Alcaide* v. *Morales et al.,* 26 P. R. R. 209; *Díaz Caneja* v. *The Administration,* 11 P. R. R. 194; *Enrich* v. *Forteza,* 18 P. R. R. 446, and *Cerra* v. *Fajardo Development Co.,* 18 P. R. R. 984.

In its opinion the trial court said:

"But it is necessary to go deeper into this reasoning. Although the title of the complaint expresses an intention to claim damages of a nature as yet unknown to us; although the twelfth count of the complaint summarizes the so-called *damages to the plaintiff,* and although the prayer of that pleading is for a sum of money as damages sustained by the plaintiff, the clear intelligence of counsel for the petitioner can not fail to perceive that if what has been alleged and proved at the trial is taken as a basis we are far from an action for damages caused to any person.

"And if in our procedure things were not what they are of themselves instead of what the attorneys may choose to call them, we should be deprived of deciding this case on its merits and would have to dismiss the complaint on account of an error in the title of the action.

"An action to recover damages is one in which, excluding what the plaintiff in justice is entitled to, a sum is prayed for as representing loss in his business, deprivation of profits of any kind, or of something, in short, independent of the restitution of the thing due itself; for he who gives or pays what he owes does not repair a damage nor compensate the person prejudiced for what he failed to receive.

"Here the plaintiff claims the sum of $27,936.86 as the result of a careful study and expert accounting and made up of several items *which he should have received* as the share coming to him at the time of the liquidation, without the necessity of recourse to the courts, because the said items resulted from the books of the partnership in dissolution after a careful examination of them and correction of the errors which through ignorance, mistake or malice existed in said books and other documents connected with the accounts. What the plaintiff seeks to recover is, in our judgment, what he was actually entitled to, and he confined himself so closely to claiming only what was his that he did not even ask for interest from the time these sums should have been delivered to him. He who asks for what is owing to him claims no damages, and if he alleges damages he should demand an additional sum, for the payment of what is lawfully due does not repair the damages caused by the failure to make payment at the proper time."

The distinguished attorney for the appellant discusses the question fully and wisely. The following are a few paragraphs quoted from his brief:

"Within these general lines the English law gradually established a considerable number of forms of action until they became an actual impediment to the good administration of justice. For that reason there was initiated in the United States a campaign to abolish those technicalities, which had its first success in 1848 in the Code of the State of New York, wherein the distinct forms of action of the English common law were *abolished.* The example of New York was followed by other states, among them the Pacific States, and Porto Rico has today a Code of Civil Procedure similar to those of Idaho and California. This code has brought into being the 'system' to which the judgment of the district court refers.

"Now, what has been the effect of such legislation? How far does the abolition of the old forms of action permit a court to depart in its judgment from the allegations of the complaint?

"These codes and all the statutes abolishing the *old forms of action* and the distinction between equity and law DO NOT ALTER the substantive right nor create *new causes of action nor destroy any of the old causes of action.*

"Hence, in California and in Porto Rico, by virtue of a special provision of the Code of Civil Procedure, all actions are well brought, regardless of the names given to them by the plaintiffs with reference to the old actions at common law, if the allegations of the plaintiffs state goods causes of action. That is to say, the cause of action must be looked for in the allegations."

Applying those principles to this particular case, we are of the opinion that the error assigned was not committed. We have reviewed the complaint and have concluded that it alleges facts sufficient to constitute a cause of action. It is true that fraud is alleged, but the acts committed are also set forth. And an analysis of those acts leads to the conclusion that whether or not the defendants acted fraudulently, the plaintiff's right to recover is the same. The plaintiff presented an extreme case. He charged fraud. Supposing that he did not prove the fraud, but proved the acts from which his cause of action is derived, and that such acts were committed through error and not maliciously, the judgment within the civil action would be the same. Even if we should adopt the view of the district court, that is, not to inquire whether fraud existed or not, we should not vary the cause of action. We should simply dispose of the action on the basis of something comprised within the allegations which are its foundation.

Perhaps we could have refrained from considering the merits of this question for the reason adduced by the appellee, but it has seemed better to express our opinion clearly.

These questions being decided, we will analyze the evidence for the purpose of determining whether or not it supports the conclusions contained in the judgment of the court.

The basis of this entire action is the articles of dissolution and liquidation already referred to and wherein the

two partners, plaintiff Gandía and defendant Stubbe, agreed to the following:

"First: That by deed No. 5 executed in San Juan, Porto Rico, on March 23, 1916, before the undersigned notary, both parties agreed to an extension for one year more of the mercantile partnership contract which they entered into before notary Eduardo Acuña Aybar on April 18, 1908, the term of which had been successively extended until by the said deed executed before me its dissolution was fixed for the 18th of April, 1917, the said deed being duly recorded in the mercantile registry.

"Second: That although the day fixed in the said deed for the dissolution of the partnership has not arrived, the parties consider it nececssary to terminate their business relations and have agreed to dissolve the partnership in the manner and under the terms to be stated hereafter.

"Third: That for the purposes of the said dissolution of the partnership a general balance and inventory was made on July 18 of the present year, in order to close the books accordingly, it being as follows:

BALANCE OF GANDÍA & STUBBE ON JULY 18, 1916.

LEDGER.

| | | |
|---|---|---:|
| Account No. | 3—Furniture | $1,014.23 |
| Account No. | 4—Lands in Trasmiramar | 12,104.86 |
| Account No. | 5—Rural property | 23,450.00 |
| Account No. | 6—Stock of Plata Sugar Co. | 1,406.25 |
| Account No. | 11—Cotton-mill building | 3,301.53 |
| Account No. | 13—Stock of Porto Rico Fert. Co. | 25,000.00 |
| Account No. | 16—Mortgages | 1,795.06 |
| Account No. | 18—Commission Dept. Cash acct. | 5,281.17 |
| Account No. | 19—Cash | 2,076.87 |
| Account No. | 20—Dividends of Pto. Rico Fert. Co. | 16,468.12 |
| Account No. | 21—Bills receivable | 128.08 |
| Account No. | 33—Cattle business | 565.86 |
| Account No. | 36—Consignment accounts | 3,989.26 |
| Account No. | 37—Merchandise | 4,055.65 |
| Account No. | 43—Commission Dept., special acct. | 4,821.70 |
| Account No. | 47—Accounts current | 37,771.21 |
| Account No. | 51—Stock of Central Pasto Viejo | 800.00 |
| Account No. | 60—Gandía & Stubbe, Liquidation acct. | 10,000.00 |
| Total | | $154,120.55 |

Account No.  1—Pedro Gandía, Capital acct._____  $50,000.00
Account No.  2—J. D. Stubbe, Capital acct._____   50,000.00
Account No. 14—J. P. Coats, Ltd._____    1,325.00
Account No. 17—Sun Life Ass. Co. of Canada_____    1,082.68
Account No. 22—Martin Falk, tires acct. _____      562.53
Account No. 23—Discounted bill_____    2,200.00
Account No. 24—Liverpool & London & Globe Ins. Co._____       47.53
Account No. 26—Taxes acct. _____._____      129.71
Account No. 27—The Palestine.  Duties acct._____      126.66
Account No. 42—J. D. Stubbe.  Personal acct. _____    4,378.11
Account No. 44—Banks_____      154.88
Account No. 45—J. D. Stubbe.  Special acct._____   13,200.00
Account No. 46—Reserve fund _____    5,757.27
Account No. 48—Pedro Gandía, Personal acct._____    5,389.51
Account No. 50—Bills payable _____    4,335.53
Account No. 56—Federico Stubbe_____    7,476.63
Account No. 59—P. Gandía.  Special acct. _____    7,954.51

        Total_____  $154,120.55

''Fourth:  That the two partners have agreed that the said dissolution shall be made in the following manner:

  ''The assets of the partnerships shall be divided between the two partners in the manner to be specifically stated hereinafter, the allotments being credited to the liabilities of the partnership; and there shall be opened a liquidation account of Gandía & Stubbe to settle all outstanding accounts not immediately susceptible of division between the partners by a liquidator to be appointed by common agreement, who shall act in the name and as the representative of both partners.

  ''Accounts receivable and accounts payable shall be entrusted to the liquidation, the partners agreeing to supply at any time such sums as may be necessary for the payment of any debts .owing by Gandía & Stubbe to third persons and which the liquidator may not be able to meet.

  ''Fifth:  In accordance with the plan agreed upon for the disolution of the partnership, Pedro Gandía takes charge of the following part of the assets:

Furniture _____ $1, 014. 25
Half of the stock of Plata Sugar Co._____     702. 12
Mortgages _____   1, 795. 06
Commission Department.  Cash account_____   5, 281. 17
Declared dividend of Porto Rico Fert. Co._____    8, 234. 06
Merchandise, a part of this account to the value of_____   1, 639. 35
Commission Department.  Special account _____   4, 821. 70
Half of the stock of Central Pasto Viejo_____     400. 00
                                                             _____
    Total_____ $28, 888. 71

"Johann D. Stubbe takes charge of the following part of the assets:

Lands in Trasmiramar, value agreed upon_____ $1, 000. 00
Rural properties cattle and account of the Julia plantation, value
    agreed upon_____  17, 500. 00
Half of the stock of the Plata Sugar Co._____     703. 12
Cotton-mill building_____   3, 301. 53
Stock of Porto Rico Fertilizer Co._____  25, 000. 00
Dividends of Porto Rico Fertilizer Co._____   8, 234. 06
Half of the stock of Central Pasto Viejo_____     400. 00
Merchandise, a part of this acct. to the value of_____   2, 416. 30
                                                             _____
    Total_____ $58, 555. 01

"The following shall be turned over to the liquidation: The difference between the value of the lands in Trasmiramar as appearing in the final balance and the price paid by Stubbe. The difference between the value of the rural properties as appearing in the final balance and the price paid by Stubbe. The cash account. The bills receivable. The consignment accounts. The current accounts. The accounts of Gandía & Stubbe, in Liquidation. ·

"Sixth: Both partners have agreed to appoint and do hereby appoint Arturo Trías, of San Juan, to take charge of the ¡pending business as above stipulated.

"Seventh: The liquidator, Arturo Trías, will take charge of the books and open the corresponding liquidation accounts, charging Stubbe and Gandía with the assets of which they have taken charge and crediting the same to the corresponding accounts.

"The liabilities of the firm of Gandía & Stubbe shall be paid by the liquidator, charging the same to the corresponding accounts.

"Eighth: The partners agree upon the following special conditions for the purpose of the liquidation:

"(a) Gandía will sell to Stubbe all of his stock in the Porto Rico

Fertilizer Company at par, one-half of all the dividends declared by the said Company remaining to the credit of Gandía.

"(*b*) Gandía may make use of the house known as the cotton factory in Santurce up to the thirty-first of December, 1916, without using it for other purposes than those for which it is now used, paying to Stubbe the rent which Gandía collects for it from J. P. Coats & Co., Ltd.

"(*c*) The balance resulting after the liquidation in favor of either of the partners will be paid by the debtor in negotiable notes of one thousand dollars each, payable one year after the date of this deed.

"(*d*) Gandía will remain in charge of the contracts for the premises of the old firm Gandía & Stubbe, without making any compensation whatever to Stubbe.

"Ninth: Although it is true that according to the provisions of the Code of Commerce no partner may demand delivery of the part of the assets corresponding to him in the division of the partnership until all of the debts and obligations of the company have been satisfied, both partners state that these debts, as far as third persons are concerned, amount to small sums which will be easily covered by the liquidator in liquidating the affairs of the company; but that at all times and places both partners will be responsible for delivering to the liquidator any sum which he may need for the prompt payment of the said obligations.

"Tenth: All of the expenses of the liquidation and dissolution of the partnership shall be charged to the two ex-partners.

"Eleventh: The effects of this deed shall be retroactive as of the 18th of July, last.

"Thus they agree, covenant and sign after carefully reading this deed and after I, the notary, fully advised them according to law, before me and witnesses Nicolás Fernández and George A. Camejo, of this city, of age, without legal incapacity to act as such, to all of which I, the notary, certify.

"At this stage and before signing this deed the parties state that according to the accounts of the Porto Rico Fertilizer Company, the said corporation has, as undivided profits, the sum of twenty thousand, two hundred and eight dollars and eighty cents; and it is hereby especially agreed that Stubbe shall pay to Gandía such sums as may from time to time be declared as dividends of the said corporation from the said undivided profits, in the proportion of the stock which Gandía sells to Stubbe."

That agreement shows the unquestionable fact of the dissolution of Gandía & Stubbe. What occurred thereafter? The evidence shows that in accordance with the agreement the two partners actually separated and the liquidator appointed took charge of the liquidation. Gandía remained in the old offices with the furniture which was allotted to him in part payment of his share of the assets, and Stubbe opened a business with his brother Federico in Tanca Street under the partnership name of Stubbe Brothers, the liquidator establishing himself in the offices of Stubbe Brothers.

Some time elapsed. Gandía demanded payment of the dividends of the Porto Rico Fertilizer Company which had been allotted to him in the agreement and payment for the stock of the said company which he had sold to Stubbe. His demand was refused and the conflict was renewed. The plaintiff then brought two actions, one against Stubbe for the annulment of the contract of dissolution and the other against the Porto Rico Fertilizer Company to recover the dividends.

In these actions Gandía was given an opportunity to have the books of the old firm and the accounts of the liquidation examined by experts and became aware of certain facts which led him to the conclusion that the liquidator had done certain things which, in his opinion, prejudiced his interests. Thereupon he brought this action.

The prayer of Gandía's complaint in this action is, first, that Trías be removed on account of the fraudulent acts and omissions which he is said to have committed in combination with Stubbe, and, second, that Trías and Stubbe pay to him the $27,936.86 of which they defrauded him by such acts and omissions.

The total amount claimed by Gandía consists of four items, as follows: $3,342.60, one-half of the banks accounts; $11,308.00, one-half of certain supposed credits; $5,052.20, one-half of the 1915 dividends of the Porto Rico Fertilizer

Company, and $8,234.06, the last dividends of the Porto Rico Fertilizer Company.

Let us examine the first item, that is, the account of the banks. Trías, who was appointed liquidator, was the former bookkeeper of Gandía & Stubbe. He struck the balance which served as a basis for the dissolution and that balance showed that Gandia & Stubbe owed $154.88 to the banks. This was not the fact. The expert witness for the defendants themselves admitted at the trial that on the date of the balance there was deposited in the banks the sum of $4,535.37. The experts for the plaintiff fixed the amount at $6,685.21. Their testimony covers hundreds of pages. The most material part thereof is as follows:

"Plaintiff: Let us now go into the account with the banks. Please show from the books before you what the court asked with regard to the account with the banks, that is, the balance of $6,685.21 which you said a few days ago Gandía & Stubbe ought to have had in the banks on July 18, 1916, notwithstanding the statement in the balance of that date that $154.88 was owing to the banks.—Witness: Journal, page 403. There is an item charged to the banks, as follows: Balance account American Colonial Bank on this day, $2,052.81; balance account Banco Territorial y Agrícola, $3,032.78; balance account Lawrence Turnure Co., $372.09; total (*sic*), $2,757.68, which is the amount at the beginning of the account on May 29, 1915, in the balance. Then comes Cash. Cash, page 656. Total amount of debits to the banks posted to the ledger during the month, $46,197.52, debit; $37,238.17, credit. Page 704, July 31. Total amount of debits to the banks posted to the ledger during this month, on July 31; debit, $35,389.36; credit, $44,334.52; page 753, Cash August 31, 1915. Total amount to the debit of the bank in that month, $59,817.52; credit, $66,281.67, September 30 of the same year, Cash, page 799, total amount to the debit of the bank posted to the ledger, $48,568.27; credit, $44,449.39; October 30, Cash, page 844; total amount to the debit posted to the ledger in that month, $42,046.92; credit, $40,784.04; October 30 of the same year, Cash, page 885; total amount of the debit of the bank posted to the ledger in that month, $45,295.85; credit, $44,515.66; December 31 of the same year. Cash, page 930; total amount of the debit of

the banks posted to the ledger, $26,158.69; credit $29,591.38. February 29 of the same year. Cash, page 1008: total amount of the debit of the banks posted to the ledger, $39,482.03; credit, $37,042.56 March 31, 1916. Cash, page 1051; to the debit of the banks, $59,744.72; credit, $58,193.93. April 29, 1916. Cash, page 1095: total amount to the debit of the banks posted to the ledger, $49,937.37; credit. $40,006.31. May 31, 1916. Cash, page 1142; total amount to the debit of the banks posted to the ledger in that month, $113,242.39; credit, $125,821.10. June 30, 1916. Cash, page 1170: total debit posted to the ledger appears here as $47,025.42 and in the ledger as $42,025.43, a difference of $5,000.

"Plaintiff: How do you explain that difference? This figure is changed. Explain well. In what books does it appear and what is the amount? In the ledger it appears as $42,025.43, which was what we verified.

"And where does it appear there? In the cash-book there is a figure changed—the 2 was made a 7 and the debit reads $47,025.43

"What is the result of this alteration? That they have failed to debit $5,000 to the bank in the ledger.

"What is the result of this? A concealment in that item of $5,000.

"Proceed.—Witness: To the credit of the banks    *    *    *

"On that same date? Yes, sir, in the same month and year Here is a credit of $35,645.35 as the total for the month and in the ledger it appears as $36,145.35; there is a difference of $500 credited to the bank in that same month.

"Plaintiff: What is the effect of that second alteration? That in crediting $500 extra it changes to the amount of $500 the funds in the bank. Changed in what sense? Of concealing $500 from the total amount that there ought to be in the bank.

"Go on.—Witness: Cash, page, 1184, July 17 of the same year. Total amount debited to the banks during the month, $25,647.93; credit, $33,196.55. What is the total of all this? The total of the debits is $678,097.51 and of the credits $672,752.39. A balance against the bank of $5,345.12. What does a 'balance against the bank' mean? That the bank owed that amount to Gandía & Stubbe on that date. Which date? July 18, 1916. Therefore, the balance against the bank on July 18, 1918, was $5,845.12? Yes, sir; but to this must be added another sum. What sum must be added? The sum that was unduly debited on May 29. Here is an amount debited to the Colonial Bank, journal, page 462, as follows: 'Error

in the cash-book through mistake of columns * * * Of what date? May 29, 1915. $2,240.09. What is the effect of this entry? That this sum has been debited to accounts current and credited to the bank. It reads: Current account, difference account American Colonial Bank, mistake of columns, $2,240.09. This is an entry that cannot be explained; it does not appear debited. To this we called Trías' attention and he stated that this entry had been canceled because it was due to an error and had been canceled later.''

''Plaintiff: After the date on which it had been made? Yes, sir. Then this $2,240.09 goes * * * ? To increase the debit of the bank, because if it is unduly credited, as Trías admitted, it increased the debit of the bank on July 18.

''You say that Trías stated that that entry had been canceled afterwards; after what? After the balance of July 18; the amount that should have appeared in the balance; it means that that balance should appear on that date. Proceed to the final liquidation of the account of the banks.—Witness: Afterwards we find, 'Discharge of the item of $900 of March 31.' Is that a discharge? A discharge for general expenses which has been charged to the balances in the column of the banks. Did you say something about this the other day? I do not remember; if they do not credit this $900, charging it to the $2,240.09, the total debit would be $7,585.21 in favor of Gandía & Stubbe, but as $900 is credited, it is reduced to $6,685.21, distributed as follows: American Colonial Bank, $4,584.79; Lawrence Turnure Co., $1,807.02; Banco Territorial y Agrícola, $293.40; total, $6,685.21. That amount you say Gandía & Stubbe ought to have had in the banks on July 18? Yes, sir. How do you explain that in the general balance it is stated on that date that Gandía & Stubbe was owing $154.88 to the banks when there should have been that amount which you have just mentioned, $6,685.21? Owing to the said concealments which were carried to the ledger. The balance was made from the ledger which shows a balance of $154.88. I also have the demonstration of the balances of the banks in the ledger.

''Plaintiff: Demonstrate the balances of the bank in the ledger. Witness: Account of the bank in the ledger, the balance of which was taken as a basis for the general balance of July 18, 1916, when the partners Gandía and Stubbe separated. Items which appear in the ledger, page 148, debited monthly to the account of the banks.

''Defendant: I wish to say that all these references of the expert to the ledger are made over the objection of this party, because the ledger is no evidence whatsoever and can not be * * *

"Witness: They are transferred from the ledger to the cash-book with the alterations which I have pointed out.

"Plaintiff: The falsifications appear in the ledger.

"Defendant: The falsifications appear nowhere.

"Judge: Let us see the entries of the ledger in connection with the cash-book. You may proceed.

"Plaintiff: Go on.—Witness: Charged to the debit. May 29, 1915. Balance, $2,757.68; June 30 of the same year, Cash, page 656, $46,197.52; July 31 of the same year, Cash, page 704, $35,389.36; August 31, Cash, page 753, $52,317.52; September 30, Cash, page 799, $48,568.27; October 30, Cash, page 844, $42,046.92; November 30, Cash, page 885, $45,295.85; December 31, Cash, page 930, $36,785.83. *Year 1916.* January 31, Cash, page 969, $26,158.69; February 29, Cash, page 1008, $39,482.03; March 31, Cash, page 1051, $59,744.72; April 29, Cash, page 1095, $49,937.39; May 31, Cash, page 1142, $113,242.39; June 30, Cash, page 1170, $42,025.43. This is the item which was altered. July 18, Cash, page 1184, $25,647.98. Balance, $154.88. Total: $673,252.39. Items entered to the credit of the bank. June 30, Cash, page 656, $37,238.17; July 31, Cash, page 705, $44,334.52; August 31, Cash, page 753, $76,281.07; September 30, Cash, page 799, $44,449.39; October 31 Cash, page 844, $40,784.04; November 30, Cash, page 885, $44,515.66; December 31, Cash, page 930, $35,649.81. *Year 1916.* January 31, Cash, page 909, $29,591.33; February 29, Cash, page 1008, $37,042.56; March 31, Cash, page 1051, $58,195.93; April 30, Cash, page 1095, $39,006.31, plus $1,000 added below, which seems to have been a mistake, making $40,006.31. There are two items here. May 31, Cash, page 1142, $125,821.10; June 30, Cash, page 1170, $36,145.35. Here is the alteration of the $500 and in the cash-book there appears $35,643.35. July 18, Cash, page 1184, $33,196.55. Total, equal to the debit, $672,252.39. Balance in favor of the bank, $154.88.

"Plaintiff: This is the demonstration? Of the balance which served as a basis for the account of the bank in making the balance. According to the liquidator? According to the balance made by the partners upon separating. On July 18, 1916? Yes, sir."

After a careful examination of all the evidence we are of the opinion that the district court was justified in concluding that on July 18, 1916, Gandía & Stubbe, instead of being in debt to the banks, had deposited in them, according to

their books, $6,685.21. Now does this conclusion justify the judgment ordering Stubbe to pay to Gandía half of that sum?

Let us go back to the instrument of dissolution. Therein it was stated that the assets of Gandía & Stubbe amounted to $154,120.55 and that it would be divided between the partners in the manner to be specifically set out, crediting the allotments to the liabilities of the partnership and opening an account of liquidation for the purpose of closing all pending transactions which were not susceptible of immediate division between the partners by a liquidator appointed by common agreement. Then followed the items of the assets allotted to Gandía, amounting to $23,888.71, and those allotted to Stubbe, amounting to $58,555.01, and it was stated that certain differences in the prices of certain properties allotted to Stubbe and also the cash account, the bills receivable, the consignment accounts, the current accounts and the accounts of Gandía & Stubbe, should go into the liquidation.

It was not expressly stated in the instrument that the account of the banks should go into the liquidation, but as it was stated that the cash account should and as it is charged with the payment of the liabilities and the account of the banks appears among the liabilities, we are of the opinion that it was properly concluded that the liquidation duly took charge of the account of the banks.

This fact makes the solution of the problem more difficult. The evidence shows that Trías was the liquidator. It also shows that Trías made it reappear in the books that there was in the banks the sum of $2,240. It does not clearly appear whether or not the difference of the $6,685.21 was made to reappear to the credit of Gandía & Stubbe. The expert for the defendants asserted that the $4,535.37 which existed in the banks on the date of the balance and dissolution passed into the hands of the liquidator and afterwards into those of the receiver and were being disposed of.

Here there is no final account of the liquidation. The liquidation was still pending, in charge of a receiver, on the date of the judgment. And it is impossible to arrive at a sure and just conclusion as to whether or not the interests of Gandía were finally prejudiced by failure to apply the actual sum in the banks to the payment of the lawful obligations of Gandía & Stubbe.

The action had the effect of making it clear what that sum should be, but the evidence did not fully show, in our opinion, that Stubbe appropriated the amount belonging to Gandía and, therefore, we think the order for its payment in the judgment was not justified.

As to Trías, in our opinion his liability is clear. He is bound to render detailed and proved accounts of all his acts as liquidator and if it should be shown finally that he had improperly disposed of, for himself or for some other person, sums belonging to the liquidation, he would be responsible for them. Probably within this same action Trías might have explained everything. But he was sued for a specific sum of money subtracted from the banks by him in combination with Stubbe, and he showed, or at least left it in doubt, that that sum, or the other true sum, passed into the liquidation; that the liquidation was still pending, and that until the final account is rendered the matter can not be fully determined. The right of Gandía to demand that the liquidation be terminated; to investigate the truth of the accounts, and to determine the liability into which the liquidator may have fallen, is clear, but he can not now recover in this action the specific sum claimed, because that sum may have been expended wholly or partially in meeting his own obligations.

Let us see what happened with regard to the second item, consisting of five different accounts. The district court found that neither the Yabucoa Sugar Company, nor Olivari, nor the Successors of C. J. Fantauzzi, nor the Fajardo Sugar Company, nor M. Zavala & Company, were ever cred-

itors of Gandía & Stubbe, but were debtors of the Porto Rico
Fertilizer Company and had paid their debts prior to the
date of the deed of dissolution. This is so evident that it
is unnecessary to discuss it.

Now, notwithstanding that it was false that these com-
panies were creditors of Gandía & Stubbe, the truth is that
in the books of Gandía & Stubbe they appeared as such, and
that these supposed debts, amounting in all to $22,616.01,
were included in the current accounts of Gandía & Stubbe,
which showed a credit balance of $37,771.21 and were made
to appear among the assets in the balance of July 18, 1916,
used as a basis for the deed of dissolution. In the deed
the current accounts are not itemized and only the balance
is stated.

In testifying at the trial Gandía showed that he was
not familiar with the facts. On the other hand, the cashier
of Gandía & Stubbe, Federico Stubbe, testified that every-
thing had been done with the knowledge and consent of
Gandía and that the facts, briefly told, were as follows:
The said firms purchased fertilizer from the Porto Rico
Fertilizer Company in the said sums, which they paid. The
money came into the hands of Federico Stubbe, the cashier
of Gandía & Stubbe. Gandía & Stubbe were the managers
of the Porto Rico Fertilizer Company. Receipts were given
to these firms in the name of the Porto Rico Fertilizer Com-
pany, but the fact was that the amounts were not entered
with the cash of the corporation, but with that of Gandía
& Stubbe.

The evidence was contradictory as to the agreement be-
tween the partners in connection with these accounts. That
of the plaintiff tended to show that Gandía, as has been
said, knew nothing definitely of what was done. That of the
defendant showed that Gandía agreed with Stubbe to entrust
Stubbe with the payment of those debts, which, though imag-
inary as to the said firms, were real as to the Porto Rico Ferti-
lizer Company, giving him a credit in the liquidation, as

was proper, equal to the liability assumed. And that, acting in accordance with this agreement, the liquidator, Trías, made the entry of August 11, 1916, wherein it was made to appear that Stubbe assumed the responsibility of paying the *creditors* Fantauzzi, etc.

The deed of dissolution does not expressly disclose anything with regard to this question. The balance of the current accounts does not appear in the specific allotments made to each partner in the same deed. We are of the opinion that the conflict in the evidence was properly adjusted by the court and that there was no clear and definite agreement on that point, although this does not mean that Gandía was absolutely ignorant of the facts. Gandía necessarily had to have knowledge of them, although it is very probable that, as he said, he believed in good faith that the amount in question was much less than the actual amount involved.

It is evident that the entry of August 11 may prejudice Gandía, but, is the order in the judgment that Stubbe pay to Gandía one-half of the said $22,616.01 justified?

In our opinion it is not. We think that what should be done in this case is to cancel the entry. It is not true that Gandía & Stubbe owed anything to the said firms. These credits being false, they should be eliminated from the credit column of the current accounts and then the debit balance will increase accordingly and it will be necessary to add to the $37,771.21, which appears in the assets, the $22,616.01 of the accounts. If Gandía & Stubbe owe an equal sum to the Porto Rico Fertilizer Company; if it does not appear from their books or in any other manner that it was wholly or partially paid to the said corporation, it is at the option of the corporation to claim it or not as its interests may dictate, but, there being no agreement as to that matter, the liquidator was not authorized to entrust Stubbe with its payment and credit it to his account in the liquidation.

Now, can this court modify that part of the judgment in the manner indicated, that is, limiting it to the elimination of the entry of August 11, 1916, and the annulment of all subsequent acts of Stubbe derived therefrom?

The greatest difficulty found by this court in the consideration and decision of this case is in the form in which it was brought. The whole case discloses a universality within a unity and it is not easy to arrive at a definite and complete solution by ignoring the universality and considering only some of its components.

Nevertheless, following the adopted theory and acting on the basis that the greater includes the less, we think that we are justified in modifying the judgment in the manner suggested. Like the banks accounts, this matter should be adjusted by both partners in the liquidation agreed upon in the instrument of July 24, 1916.

A similar decision is necessary in connection with the third item, that is, the dividends of the Porto Rico Fertilizer Company for the year 1915.

These dividends were entered in the books and thereafter the liquidator, on his own account and without there being any stipulation in the deed or any agreement between the partners, canceled the entry and stated that the said dividends had not been distributed or even declared by the corporation.

It is a fact that when the record is examined carefully it is impossible to avoid the conclusion that in the liquidation Trías acted always in favor of Stubbe. There is no basis, in our opinion, for sustaining that part of the judgment which orders Stubbe to pay to Gandía half of the said dividends, but the entry made by the liquidator should be annulled. Perhaps this item has a strong connection with the preceding one. On the one hand it seems that Gandía & Stubbe used to take money belonging to the Porto Rico Fertilizer Company. On the other hand it appears that the Porto Rico Fertilizer Company declared dividends and did

not actually pay them to Gandía & Stubbe, or kept the management account with them still open. There existed in the business of both firms a deplorable confusion which was improper, but all questions should not be decided in favor of one partner and against the other. Gandía can not have the support of the courts to the extent that everything may be adjusted in his favor and against Stubbe, but in order that everything may be made clear and fairly adjusted.

The order for the payment of the $8,234.06 out of the last dividends of the Porto Rico Fertilizer Company is sustained. This is in fact the claim which upholds this action. It is a question which took independent form by reason of the contract of dissolution. The sum was clearly allotted to Gandía and the action of the liquidator was not merely circumscribed to making the entry of November 30, 1916, in the books, but taking it as a basis, as shown by the evidence of the defendants, Stubbe appropriated to himself the dividends which had been allotted to Gandía and assigned them to Stubbe Brothers. The liquidator and Stubbe are clearly liable to Gandía for these dividends.

The appellee contends in his brief that Gandía lost nothing because the liquidator credited him with the dividends in the liquidation. This is not clear, but even if it were, the fact is that by an express agreement in the deed of dissolution the dividends were allotted directly to Gandía and they should have been paid to him immediately.

The defendants raised many questions at the trial with regard to the admission of evidence. These questions are all of a similar nature, and considering the attitude of the defendants themselves in introducing their evidence, we feel justified in holding that if any technical error was committed it was not prejudicial to the appellant.

With the exception of that which refers to the removal of defendant Trías as liquidator of Gandía & Stubbe, we have already expressed our opinion in connection with the errors assigned in his appeal by plaintiff Gandía. The trial

judge concluded that it was not "necessary to consider the removal of liquidator Trías because he ceased to be such liquidator some time prior to the day of the trial." Notwithstanding this, Gandía insists that his removal should be adjudged.

In the answer to the complaint it was alleged that Trías had resigned as liquidator. Trías, therefore, anticipated the prayer of the plaintiff and the district court apparently acted thereafter on the belief that this matter had been disposed of, especially after it appointed a receiver to succeed Trías. This being the case, we are of the opinion that the error assigned was not committed.

However, the resignation of Trías does not exonerate him from the liabilities incurred, and we have already determined the extent of such liabilities.

By reason of all the foregoing, and deciding both appeals, the judgment appealed from must be reversed and another entered in accordance with the principles and conclusions laid down in this opinion.

This complicated case is an example of the difficulties, the material loss and the moral confusion which may result from a lack of harmony between two men who for many years worked together with a common purpose. A half-hour of good faith and open and fair mind would be sufficient for these two men to adjust all these questions and settle them forever. Nevertheless, sessions and sessions of the courts; days and days of struggle; criminal prosecutions; protracted forensic arguments, and voluminous records have taken the place of that happy half-hour, and all to obtain a judgment which, though it finally disposes of the action, leaves many questions pending to be made clear and practically determined.

*Reversed.*

Chief Justice Hernández and Justices Wolf, Aldrey and Hutchison concurred.